IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

**FILED**
JAN 26 2016
PATRICK KEANEY
Clerk, U.S. District Court
By _____
Deputy Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>KALVIN KYLE McCOWN, a/k/a Rainman,<br>BRIAN THOMAS GREEN, a/k/a Country,<br>TRAVIS LEE HILL,<br><br>*Defendants.* | SEALED<br><br>Case No.<br><br>**CR 16-007-JHP** |

**INDICTMENT**

The Federal Grand Jury Charges:

**Introduction**

1. At all times relevant to this Indictment, the defendants **KALVIN KYLE McCOWN a/k/a Rainman, BRIAN THOMAS GREEN a/k/a Country, TRAVIS LEE HILL** and others known and unknown, were members and associates of the Aryan Brotherhood of Texas (hereinafter the "ABT"), a criminal organization whose members and associates engaged in acts of violence and other criminal activities including narcotics distribution, murder and assault. At all times relevant to this Indictment, ABT operated in the Eastern District of Oklahoma and elsewhere.

2. The ABT, including its leaders, members, and associates, constituted an "enterprise", as defined in Title 18, United States Code, Section 1959(b)(2) (hereinafter "the enterprise), that is, a group of individuals associated in fact that engaged in, and the activities of which, affected interstate and foreign commerce. The enterprise constituted an ongoing organization whose members and associates, functioned as a continuing unit for a common purpose of achieving the

1

objective of the enterprise.

    3. The structure of the ABT included, but was not limited to, the following:

    a. The ABT was a violent "whites only" prison-based gang with thousands of members operating inside and outside of state and federal penal institutions throughout Texas and the United States.

    b. The traditional power centers of the ABT, and members of the gang's leadership structure, were predominately located in prisons operated by the Texas Department of Criminal Justice (hereinafter the "TDCJ") and metropolitan areas throughout Texas. The ABT was established in the early 1980's within the TDCJ. The ABT modeled itself after and adopted many of the precepts and writings of the Aryan Brotherhood, a California-based prison gang that was formed in the California prison system during the 1960's. The ABT offered protection to "white" inmates if they joined the gang.

    c. The ABT had a detailed uniform organizational structure, which is outlined – along with various rules, procedures, and code of conduct – in a written "Constitution" widely distributed to members throughout Texas and elsewhere.

    d. In Texas, there were two competing ABT factions. Each faction followed the leadership of their respective faction. Each faction had similar chain of command structures and had a defined militaristic rank structure. ABT members referred to the gang as the "Family". The hierarchy of each faction was divided into the five (5) separate TDCJ regions. Each region included a "General", two "Majors", several "Captains", "Lieutenants", "Sergeants-at-Arms", and numerous "Soldiers". The General was the highest authority within a Region. Subordinate ranking members served to

support the General, and enforce gang members' discipline and adherence to established ABT rules and by-laws. The ABT's rank structure remained constant; however, personnel changes (promotions, demotions, terminations) occurred frequently.

e. The five ABT Generals comprised a steering committee that was referred to as the "Wheel", which controlled all criminal aspects of the gang. Each Wheel member was responsible for appointing his subordinate, ranking members (Majors) within his respective region. This included appointment of an inside Major (in-custody member) and an outside Major (referring to a member in the "free world"). These Majors, in turn, were responsible for appointing their subordinate Captains and Lieutenants, who, in turn, appointed their Sergeants. Wheel members typically remained in place regardless of their custody status, unlike other ranking members, who typically lost rank when their custody status changed.

f. ABT leaders had the authority within the gang to issue "D.O.'s" (direct orders) and mete out punishment. A "D.O." was an assignment given to a subordinate ABT member that would serve a purpose for the ABT. The "D.O." could range from a leader ordering a "S.O.S." (smash on sight), meaning the assault of a rival gang member or of an ABT member who had committed a violation of the ABT rules, to a "green light" or "X" meaning the murder of a rival gang member or of an ABT member who had committed an egregious violation of the gang's rules. Failure to perform a "D.O." resulted in the assigned member being in violation of the rules. Punishment for failing to complete the "D.O." could range anywhere from a beating to death.

g. Members of the ABT greeted each other, and showed their membership in the gang, using a hand-sign intended to represent the letters "A" and "B". The ABT

employed a robust symbology as well, using depictions of Nazi-era inspired symbols and artwork to demonstrate their affiliation. Members often had tattoos incorporating one or more Nazi-era symbols including but not limited to the Nazi flag, Swastika, Iron Eagle and Schutzstaffel ("SS") lightning bolts. The most coveted tattoo of the ABT membership was the ABT patch, which could only be worn by fully made members who generally ascended to full membership by committing a "blood-tie" (aggravated assault or murder) on behalf of the gang. The design and shape of the patch would vary, but usually consisted of a shield, encompassing a sword, Swastika, and crown – with the letters "A" and "B" and lightning bolts of the Nazi "SS" over the top of the shield – and "Texas" under the bottom of the shield. Symbols unique to the ABT lexicon included "GFBD", "14-88", "12", "23", "23/16", "28", and "100%". The gang also incorporated these symbols into tattoos, which they used to show their membership in the gang. The colors associated with the ABT generally consist of the colors black and red. Members sometimes wore clothing in the chosen colors or incorporating some of the gang's other symbols or phrases.

    h. Once released from incarceration, ABT members were required to remain loyal to the ABT and were required to immediately report to the outside leaders to further the goals of the ABT through criminal activity. One of the goals of the ABT was to recruit new members. ABT members were recruited from both inside and outside state and federal penal institutions. In order to be considered for ABT membership, a person had to be sponsored by another ABT member. Once sponsored, a prospective member had to serve an unspecified term of usually not less than one year, during which he was referred to as a prospect, and his conduct was observed by other gang members. During this

period, the prospect was required to study and learn the ABT Constitution and the "Prospect Schooling Guide". The prospect was also required to sign a "Blind Faith Commitment", whereby he pledged an unconditional commitment to follow all orders issued by ABT superiors. While a prospect, the individual was considered part of the ABT family and entitled to the full protection of the gang. The prospect was also subjected to the rules and order of the gang. If the prospect's conduct during the probationary period was deemed satisfactory, he was admitted by a majority vote of all ABT members present. All ABT members were required to attend monthly "church" meetings where criminal activity was discussed, financial proceeds from criminal activity were collected including, but not limited to, collection of drug proceeds from subordinate gang members for senior ABT gang leaders, and beatings of fellow ABT gang members were administered.

     i. In addition to members, the enterprise included those closely affiliated with the ABT, who were called "associates". While females were not allowed to become members of the ABT, those who associated with the ABT and engaged in criminal activity for the benefit of the ABT were often referred to as "featherwoods". Associates who did not fulfill their obligations to the ABT were sometimes subject to violence, including murder. Female associates functioned as communication hubs, facilitating communication among imprisoned members throughout the penal system through the use of the telephone, Internet and United States mail.

### Purpose of the Enterprise

4. The purposes of the enterprise included, but were not limited to, the following:

     a. Enriching the leaders, members, and associates of the enterprise through,

among other things, the illegal trafficking of controlled substances and firearms.

b. Preserving and protecting the power, territory, operations, and proceeds of the enterprise through the use of threats, intimidation, violence, and destruction, including, but not limited to, acts of murder, attempted murder, assault with a dangerous weapon, and other acts of violence.

c. Promoting and enhancing the enterprise and its members' and associates' activities.

d. Keeping victims in fear of the enterprise and in fear of its leaders, members, and associates through threats and actual violence. The leaders, members, and associates of the enterprise undertook all steps necessary to prevent the detection of their criminal activities and sought to prevent and resolve the imposition of any criminal liabilities upon their leaders, members, and associates, by the use of murder, violence, and intimidation directed against witnesses, victims, and others.

e. Providing support to gang members who were charged with, or incarcerated for, gang-related activities.

## Means and Methods of the Enterprise

5. The members and associates of the enterprise attended regular meetings, referred to as "church", where criminal activity was discussed, financial proceeds from criminal activity were collected including, but not limited to, collection of drug proceeds from subordinate gang members for senior ABT gang leaders, and beatings of fellow ABT gang members were administered.

6. To enforce discipline and the rules of the enterprise, members and associates of the enterprise and their associates engaged in a system of "violations", in which the defendants and

others attempted to murder, conspired to murder, physically assaulted, and threatened harm to those members and associates of the enterprise who violated rules, questioned authority, or posed a threat to the leaders, members, or purposes of the enterprise.

7. Members and associates of the enterprise employed and used gang-related terminology, symbols, gestures, and color schemes.

8. To perpetuate the enterprise and to maintain and extend their power, members and associates of the enterprise committed and conspired to commit acts including murder, intimidation, and assault against individuals who posed a threat to the enterprise or jeopardized its operations, including rival gang members, ABT gang members of a rival ABT faction, and witnesses to illegal activities of the enterprise.

9. Members and associates of the enterprise managed the procurement, transfer, use, concealment, and disposal of firearms and dangerous weapons within the enterprise to protect gang-related criminal activities, personnel, and operations and to deter, eliminate, and retaliate against competitors and other rival criminal organizations and persons.

10. Members and associates of the enterprise regularly financed their activities through funds obtained in the illegal trafficking of controlled substances, including, but not limited to, the distribution and possession with the intent to distribute methamphetamine.

11. Members and associates of the enterprise hid, misrepresented, concealed and caused to be misrepresented, concealed, and hidden, the objectives of acts done in furtherance of the conspiracy and used coded language and other means to avoid detection and apprehension by law enforcement authorities.

## COUNT ONE

### KIDNAPPING IN AID OF RACKETEERING
### [18 U.S.C. §§ 1959(a)(1) and 2]

12. At all times relevant to this Indictment, the ABT, as more fully described in paragraphs 1 through 11 of this Indictment, which are re-alleged and incorporated by reference as though set forth fully herein, through its members and associates, engaged in racketeering activity as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), namely acts involving murder and kidnapping in violation of Texas State law and dealing in controlled substances in violation of Title 21, United States Code, Sections 841 and 846.

13. On or about July 13, 2011, in the Eastern District of Oklahoma and elsewhere, the defendants, **KALVIN KYLE McCOWN a/k/a Rainman, BRIAN THOMAS GREEN a/k/a Country, TRAVIS LEE HILL**, and others known and unknown to the Grand Jury, aiding and abetting each other, for the purpose of maintaining and increasing position in the ABT, an enterprise engaged in racketeering activity, kidnapped Kenneth Earl Ayers, in violation of Title 18, United States Code, Section 1201(a)(1).

All in violation of Title 18, United States Code, Sections 1959(a)(1) and 2.

## COUNT TWO

### MURDER IN AID OF RACKETEERING
### [18 U.S.C. §§ 1959(a)(1) and 2]

14. Paragraphs 1 through 11 and paragraph 12 of Count One of this indictment are re-alleged and incorporated by reference as though set forth fully herein.

15. On or about July 13, 2011, in the Eastern District of Oklahoma and elsewhere, for the purpose of maintaining and increasing position in the ABT, an enterprise engaged in racketeering activity, the defendants, **KALVIN KYLE McCOWN a/k/a Rainman, BRIAN THOMAS GREEN a/k/a Country, TRAVIS LEE HILL**, and others known and unknown to

the Grand Jury, aiding and abetting each other, did unlawfully and intentionally murder Kenneth Earl Ayers in violation of Title 21, Oklahoma Statutes, Section 701.7(A) and (B).

All in violation of Title 18, Unites States Code, Sections 1959(a)(1) and 2.

### COUNT THREE

### KIDNAPPING
### [18 U.S.C. §§ 1201(a)(1) & 2]

16. On or about July 13, 2011, in the Eastern District of Oklahoma and elsewhere, the defendants, **KALVIN KYLE McCOWN a/k/a Rainman, BRIAN THOMAS GREEN a/k/a Country, TRAVIS LEE HILL**, and others known and unknown to the Grand Jury, aiding and abetting each other, did unlawfully and willfully seize, confine, kidnap, abduct, carry away and hold for the purpose of punishment and retribution, and, in committing or in furtherance of the commission of the offense, did willfully transport Kenneth Earl Ayers in interstate commerce from Texas to Oklahoma, regardless of whether he was alive when transported, and in committing this offense, did cause the death of Kenneth Earl Ayres, in violation of Title 18, United States Code, Sections 1201(a)(1) and 2.

A TRUE BILL:

MARK F. GREEN
United States Attorney

_____
ROB WALLACE, OBA # 13130
Assistant United States Attorney

Pursuant to the E-Government Act, the original indictment has been filed under seal in the Clerk's Office.

s / Foreperson
FOREPERSON OF THE GRAND JURY